Mr. Garnett, would you like to reserve time for rebuttal? Five minutes, please. Five minutes, okay. Good morning, Your Honors. May I please report? Quanta Computer maintains that it has an implied license to drives sold by licensees, Sony and Philips, even if the drives are made by Quanta Storage. Does this issue of the implied license cover all the alleged infringement here or only part of it? Almost all of the alleged infringement. There were a few drives very early in the damage period. It's a nominal number of drives sold directly from Quanta Storage to Quanta Computer, and we don't contend that those drives would be covered by the implied license document. Okay, and what about the relationship between the implied license argument and the exhaustion argument? Does that – do they cover the same items? No, I believe – I'm sorry, yes, Your Honor, they would cover the same items. Okay. Yes. There would be no authorization under the HATMATE rights for drives sold directly from Quanta Storage to Quanta Computer. There's no dispute that Quanta Storage – In your view, if we were to rule in your favor on the implied license, there would be no reason to reach the exhaustion question. Yes, Your Honor. Okay, thank you. There is no dispute that Quanta Storage makes drives for Philips and Sony pursuant to HATMATE rights in those companies' licenses with laser dynamics. Quanta Computer does not make optical disk drives. It makes computers and assembles them for companies like HP and Dell. Relying upon the DuPont case out of Delaware, the district court found an impermissible sublicense existed when Quanta Computer purchased Quanta Storage-made drives from licensees Sony and Philips. But the DuPont case is readily distinguishable on its facts. In DuPont, the single entity, Union Carbide, both made and used all the methamyl product at issue there. Here, Quanta Computer and Quanta Storage are separate companies. Quanta Computer owns less than 30% of the stock of Quanta Storage, and Quanta Computer does not control the day-to-day operations of Quanta Storage. What you're saying is, to decide whether this case falls closer to DuPont than to Cyrix, we have to examine the relationship between QCI and QSI. For example, if they were one and the same, if one was the alter ego of the other, then you'd be closer to DuPont, correct? I think we might be closer to DuPont, but I think DuPont is still distinguishable, even if the court finds that Quanta Computer and Quanta Storage are the same entity. How so? How so are you still safe from DuPont? Well, unlike the licensee Shell, in the DuPont case, neither Sony nor Phyllis is required to sell all or any portion of DuPont's storage-made drives to Quanta Computer. That's very different. In DuPont, Shell was required by contract to sell back to Carbide all the methamyl that Carbide made, making the have-made and purchase-and-sale transactions one and the same. There's no restriction also on Sony or Phyllis' have-made rights here, unlike in the DuPont case where there was an express prohibition on sub-licensing, which the court used to evidence DuPont's intent to limit the have-made rights. But there's no sub-license right under this agreement, right? There's not, Your Honor. What you're saying is it was more emphatic. The intent was made emphatic by the fact that they ruined you can't sub-license, as opposed to saying I don't have to write it in because we know you don't have it. That's your point. It's close to my point. What the court really did was it used the express prohibition as a limit on have-made rights, saying if there was no express prohibition on sub-licensing, maybe I couldn't infer any intent on the part of DuPont to limit have-made rights. But since there was a clear express prohibition on sub-licensing, I'm going to use that as evidence of DuPont's intent to limit the have-made rights. And that's also different here. To refresh my recollection, what happened here is that QCI is placing orders with Philips and or Sony.  How does the commercial transaction play out? So the commercial transaction is completely separate from the have-made rights. I understand. Just in terms of QSI that's making, it's not in any trouble. It's got their have-made rights. Yes. So Quanta Storage makes drives for Sony or Philips under their have-made rights in their agreements with Laser Dynamics. How do they get into the hands of QCI? Okay. So most of the time, more than 85% of the time, and sometimes for HP, for example, 100% of the time, Dell and HP negotiate with Sony and Philips for the purchase of the drives. Wait, I'm confused. I thought that the drives were sold by Sony and Philips to QCI. No? Infrequently. About 15% of the time that happens. Okay. And predominantly the drives are sold from Sony or Philips to HP or to Dell. Then HP or Dell will sell the drives to Quanta Computer who assembles them into a computer and sells the computer back into the US. Even when Quanta Computer buys a drive from Philips or Sony, it does so at the request of HP or Dell. And in fact, HP and Dell negotiate the price at which Quanta Computer is to buy those drives directly. So even in the situation where Quanta Computer is buying the drives, it is HP and Dell, the testimony of Mr. Yanbao and Mr. Chen from HP and Dell makes this very clear, they negotiate those contracts all the time. Were HP and Dell then supplying the optical disk drives to QCI? Yes, sir. They're being drop shipped by QSI, right? Yes, thank you very much. That was my next question. That's how they get there. That's how they get there. So the orders are sort of flying around on the internet, do this, buy these. But then the message comes down to QSI from presumably Dell, pardon me, from Philips or Sony to ship these things down to QCI. Yes, sir. And I think that's important. There's no reason to require somebody to ship the drives all over the world in this situation. As long as the paper trail is clear, so that if there were perhaps a running royalty that Sony and Philips had to pay, it would show up in their books and they would pay that. So the people... These are marketplace-driven harm's length transactions. Yes, sir. And it just happens QCI and QSI have this connection because the ultimate purchaser probably of the computer, Dell or whatnot, is dictating whose drives are supposed to go in there and that's what's happening. That's correct. And it's also different than DuPont in that quanta storage-made drives are used by the entire industry. They're not just used by a quantum computer. So it's not a situation where all of the quanta storage-made drives wind their way up in a quantum computer. That's not... Or a computer made by a quantum computer. That's not how it works. These are market-driven transactions. The drives are sold to all the different OEMs all across the world. The contracts are negotiated by Dell and HP. Even if there's a direct purchase on the books from a quantum computer, by a quantum computer from someone. Nobody's arguing that this issue can't be resolved on summary judgment. This went off on a summary judgment, right? It did. And I think the facts are pretty well established here. The only evidence to rebut our implied license that Laser Dynamics put forward is the fact that quantum computer and quanta storage are affiliates. Correct me if I'm wrong. I didn't understand Laser Dynamics to be saying, you know, in the event that we think there's an issue, it has to go back for trial. I agree. We look at all these commercial data points and decide what the true nature of the relationship between QCI and QSI. I think the record is fairly well-developed. Yes, John. Two companies can be affiliated and still have arm's-length transactions, or at least their transactions can reflect market realities. Was there any evidence presented that that was the case? There was no evidence presented that that was not the case. In fact, there was evidence about a mass price. Okay, the mass price issue is simply when HP and Dell sell the optical disk drive to quanta computer, they raise the price that's reflected in their books so that quanta computer doesn't know what they actually paid for the drive. But the mass price is always higher than the actual price of the ODD. So there's nothing mysterious about that. It's recorded on Dell and HP's books, and they produced evidence in this case of what the actual price was. And then they produced evidence of what the mass price was. And it's just simply something that Dell and HP used to hide from the industry, if you will, what price they're actually able to get out of Sony and Dell because it's extremely competitive. They're always looking for the lowest price possible, and Sony and Philips are always looking for the highest price possible. There's a lot of negotiations that go on between Sony and Philips and HP and Dell, and that's why they use the mass price. Nothing mysterious at all about that. Okay, we'll give you your five minutes of rebuttal back. Okay. Okay? Thank you. Mr. Gaudet? Gaudet. Gaudet. Yes, Your Honor. Good morning, and may it please the Court. Matt Gaudet here for the Plaintiff Appellant Laser Dynamics. I want to pick up with a question, Judge Clevenger, that you asked, and this is a crucial procedural clarification. We did not move for summary judgment on the issue of implied license or exhaustion. The Court did not grant us summary judgment. Frankly, somehow we missed that point in the response brief we put in, but it is unambiguous in the record. I want to be very specific. What did happen? What did happen is that Quanta moved for summary judgment on both issues. Our response, which is at JA 3596, says, there's a question of fact on both issues. Alternatively, we should get a 56F additional discovery. Our surreply at JA 7177 said exactly the same thing. Judge Ward's order does not say anything about any motion that Laser Dynamics filed because we didn't file any motion. It doesn't suggest he granted a summary judgment. That order is in the record at JA 22 and 23. So what are we supposed to draw from that? Your Honor. That if we rule against you on the implied license point, that you want a remand so that you can conduct more discovery? No, Your Honor. Actually, what it means is, where the record stands, is that as of the time the trial started, the judge at the district court found that there was a question of fact. And the reason was we didn't want to be in a position of bearing a burden on appeal, of having to deal with this as a matter of law, because these facts, as we went through, there are some complicated facts here. At that point, the defendant, who had the burden of proof on this issue, needed to put on evidence at trial on this issue, needed to have a jury charge on this issue, needed to file a pre-verdict JMOL motion on this issue, and needed to file a post-verdict JMOL motion. And you've never argued this before? Your Honor. Was that correct? That's correct. Okay, so why isn't that a waiver? Your Honor, this is not an issue on which we bear the burden of proof, and it's not an issue on which we raise it. That's why I raised the issue was that I'm reading what I'm saying, and I'm saying there may well be some real issues of factor as to what's the true relationship in these transactions, but I'm not seeing anywhere in the appeal up here that you say the error was that. Your Honor, to be clear, we filed a single brief on this issue, and it was following the brief that the plaintiff put in where they incorrectly said summary judgment was granted, that it's simply false. So you didn't challenge that? Your Honor, I don't know how it wasn't challenged, but we didn't have a defendant that challenged that. But, Your Honor, it doesn't exist in the record. You've got a problem. But why don't you go on and address the merits before we run out of time on the applied license question, because it seems to me that you've got a problem bringing this within the Delaware case because these are not the same party. They have a relationship, but they're distinct companies with only about a 30% stock ownership. Sure. Your Honor, I want to take it back again to the summary judgment procedure where the question is what evidence was in the record at that point. Now, address the merits of the applied license question, okay? Yes, Your Honor. On the merits, the evidence in the record was that this was purely a paper transaction where literally all that happened is that QSI walked drives right down their campus, they didn't even ship them, to QCI. So what? They're separate companies. There was no evidence in the record at summary judgment suggesting that they weren't, in effect, having the exact same financial interest. And, in fact, this notion of it being an arms race... But there were factual allegations being made in support of QCI's motion here where they're saying here are the facts, A, B, and C. And their argument is that you didn't countermand those. You didn't come in and say they're not telling the truth. Your Honor, we did very much make the point that QSI and QCI functioned together as one entity that makes this just a paper transaction. They did not. They have the burden of proof. They did not put in the evidence that counsel just referenced in terms of there being less than 30% ownership. The notion of the arms race transaction... Wait a second. That information is in the record. How is it in the record? It's in the record because there was a trial later at which some of those facts came out of the trial. And there was a second trial as well. But the other key point, Your Honor, is this notion of arms loan transactions, when Dell is negotiating things, all of that. None of that was in the summary judgment. Let me ask you hypothetically to assume that they are separate companies, that there's only a 30% ownership. How does this case then come within the Delaware case? Isn't it clear that you can have a half-made license and sell it to Philips or to Sony and have it sold to an affiliated company? What's the matter with that? Why is that an evasion of the half-made license? I think the Syrix case answers that question very directly, which is if the transaction between the company doing the making and the transaction then back with the company that buys it from the licensee is part of two halves of the same transaction, in that circumstance, it is a sham. It's the term that Syrix uses. And the Syrix case says... What's a sham about it? I don't understand. In that instance, it is indistinguishable from a sub-license. In other words, it's not a situation where the licensee has some separate third-party transaction where the licensee either specifies how something should be built or is retaining inventory. In this instance, every single drive in each one of these transactions that QSI makes is walked right over campus to QCI and delivered in order for them to be sold to QSI. You're relying on the shipping arrangement, but in fact, it goes back to Sony, and Sony sells it to QCI, right? It doesn't go back to Sony. No, not physically. But the title, the ownership, is in Sony, and Sony sells it to QCI. And, Your Honor, that's exactly how the Syrix court distinguishes DuPont. Answer my question. Isn't that what happens? On paper, title would pass from one to the other, and a royalty would be paid. Why isn't that enough? Because what the Syrix court said is that if the Syrix fax had simply been a paper transaction where the physical items don't move and it's nothing but a paper transaction, that would have been a sham. And all that's happened here is instead of having... Did Syrix say that? Syrix said that, Your Honor. That is at 1387. I'm sorry. It says in DuPont the arrangement was a sham. Correct. It's distinguishing its fax, Syrix, where it finds there is an implied license from DuPont, and it's saying in DuPont the issue was... Well, so you have to show that this arrangement in this case was a sham. But I don't see that there's any proof that it's a sham. Your Honor, the evidence in front of the district court, again, was that entities that are commonly owned on the same campus, on the same transaction, simply walk from one to the other and... That makes it a sham? That certainly raises the question of fact as to whether it's a sham, Your Honor. And that's all that we ask for in front of the district court. And while we don't think the record can be recreated, if you will, nonetheless, at most what would happen is simply a question of fact here that would have to be resolved. But on summary judgment, the evidence in the issue of us not putting in evidence that it was not a legitimate transaction has the burden of proof reversed. Every element proving this affirmative defense fell on FONTA. And as they acknowledged, there was no evidence at all in the summary judgment record to suggest that this transaction was legitimate. The discussion about arm's length transactions and everything, that was not in the summary judgment record. What about patent exhaustion? Your Honor, the sales that you contend occurred abroad were made from, what, to Sony to QCI? Is that what we're talking about? Those kinds of transactions? Those would be the sales that the, at Quanta is alleging, would exhaust patents. And surely somebody must have contemplated that those items that were sold were going to be brought to the United States, unlike the jazz photo situation. Your Honor, there was absolutely no evidence in the summary judgment record of any sale in the United States whatsoever. Assume hypothetically that Sony intended that the optical disk drives would be brought to the United States. Would that distinguish the jazz photo cases? Your Honor, I don't think it would in that the jazz photo cases draw the line in terms of there being a necessity, in terms of the simple territoriality requirement. Now, it would, I guess at some point you could get into the facts about whether or not there would be a fact dispute about whether, where the sale really occurred. But in this case... No, but I'm not talking about where the sale occurred. I'm assuming for the moment the sale occurred abroad. But Sony, in making the sale, says, we know that you were selling these so that you could bring them to the United States. Why wouldn't that distinguish the jazz photo case? Your Honor, first of all, nothing like that happened. There was no suggested evidence like that. But in terms of how that would reconcile with the jazz photo cases, my understanding in the jazz photo cases is it's a fairly hard and fast rule in terms of the sale has to be in the United States. Now, the gray area would be, when is the sale in the United States or not in the United States? And on there, there could be some fact issues. Why shouldn't you have exhaustion if somebody makes a sale, if the place of sale is just an accident, it's contemplated that the item is going to be brought to the United States, and the licensee or the patentee says, we know you're going to bring that to the United States. Why shouldn't there be exhaustion? Your Honor, under those facts, it would be a closer call. There was absolutely nothing like that in this record. In fact, they affirmatively disclaimed any knowledge of even QCI, QSI or QCI knowing where things were going, and there was no evidence to suggest that somebody did anything other than simply accept a check. So, those facts would get us into a grayer area, but there is nothing in the record. Would that all end up being disc specific or order specific? Absolutely, Your Honor. Some of the computers are going to be sold in China, London, and other places. Exactly. We were told over and over again in discovery that these entities have no idea where these different pieces are going, that they couldn't track them. And be that as it may, whether it goes that forward, simple, lack of evidence, there was absolutely no effort on the summary judgment stage for them to put in evidence suggesting U.S. sales. Their position was, it doesn't matter, foreign sales cover. And we know that because in the appellate brief, the only thing they cite in the appellate brief to suggest there were U.S. sales is our opposition to their summary judgment motion, and there's a reference to the fact that eventually, there is a sale to Dell or whoever else, and that doesn't give them the summary judgment. Do you have anything further? I don't, Your Honor. I know that there was a reference to the hypothetical negotiation date. I can speak to that issue if the Court has any questions on that topic. In this instance, the reason the hypothetical negotiation date was set where it is is that Qantas Council was asked specifically by the District Court, do you have any evidence that Qantas Computers, which is the only defendant that went to the jury, had any knowledge of the patent before 2006? The answer was, no, we don't. The case law is clear that the hypothetical negotiation date cannot be earlier than when infringement began. This is only an indirect infringement case against Qantas Computers. Infringement could not begin before the date on which they had actual knowledge of the patent. Okay, and for this purpose, you've decided to separate QSI and QCI? No, Your Honor. Actually, in both instances, we say they are related entities, but they are not the same entity. And likewise, the District Court made the same... And to be clear, it's a very fact-intent issue. There was no suggestion... If Qantas had come to the District Court and said, Your Honor, actually, we believe that notice to QSI should count as notice to QCI, and here's the evidence as to why, that would be one thing. But they didn't. They said, no, we have no evidence that QCI got any notice whatsoever. And so, again, these are both fact-intensive issues that have to be decided on the record that actually exist. And on the record that exists, both resolutions were absolutely correct. So where in the record do we find the District Court's reasoning for setting the date of 2006? Your Honor, that is... What was the reasoning? That is at JA31. There is colloquy with the District Court judge. And the District Court judge asked counsel for QANTA, What's the earliest date that you had noticed, that QANTA computers had noticed in 2006? I think it's 2006. Counsel told me, Do you have any evidence of anything earlier than 2006? Counsel for QANTA said, No, we don't. And the judge said, Well, that's the date. The case law cited by QANTA suggests that where infringement began, but there is a limitation on damages, and the two examples in the case they cited are the six-year bar on damages and a marking issue on damages, you still start from the date infringement began, an artificial, not artificial, but a separate limitation on damages. That's not this at all. Infringement, indirect infringement doesn't begin until they have noticed. So the judge's theory was, you can't have it both ways. You can't treat them as separate for purposes of the implied license and then treat them as a single company for purposes of the hypothetical negotiation date, right? No, Your Honor. I think what the judge... He said you can't have it both ways. He said you treat them as totally separate. You can't have it both ways and treat them as the same here? I'm sorry. That's what he told to QANTA. And it's QANTA that...  You can't have it both ways? Actually, no, Your Honor. The reason is that with respect to QANTA, in order to prove the hypothetical negotiation, it would actually have to be the same party for the notice to apply. It would have to be the actual same party, not really a related party. So they're saying on one, it's the same party. On the other... All we're saying in both instances is that they're different, but they're related. And that's exactly what the exhaustion order says. It says sales from QSI to QCI or other QANTA entities. So the judge's point was simply, it's not that they're the same, it's that they're related. And the fact that they're related means this is not an issue on which I can grant summary judgment. Okay, thank you. Thank you. The court is correct that they never argued that the court did not grant summary judgment. And let me read you from Judge Ward's order. However, for purposes of the trial... Which page is this? This is at JA-22. However, for purposes of the trial, the court advises the parties of the following holdings. The QANTA defendants do not have an implied license with respect to drives that are manufactured by QSI, QANTA Storage, and eventually sold to QCI, QANTA Computer, or another QANTA entity. The judge granted summary judgment. Even if he didn't, the court can rule on denial of a summary judgment under an abuse of discretion standard. But Judge Ward was very clear in his order that he was granting summary judgment on this issue. They didn't raise this issue, so I had to sort of scramble and find a few pages of what was actually in the record, and I just want to correct the record. It was very clear, JA-7113, about the relationship between QCI and QSI. That was made clear in the summary judgment briefing. On JA-7109, it was very clear that QCI obtained the majority of drives used in its QCI or in its computers from customers, and those customers include Dell, IBM, HP, Gateway, and Apple, all of whom are U.S. companies. So that's the best I could do in just the few minutes I was given, but I think the record was developed pretty clearly on this issue, both at the summary judgment stage and later at trial as well. Turning to the notice issue, if I may, I didn't have a chance to address the hypothetical negotiation date. I think the issue, the legal issue, is whether in an indirect infringement claim the date of first infringement for purposes of a hypothetical negotiation should be the date of first sale or should it be the date that a party had notice of the patent.  with the court's view that during a hypothetical negotiation, all the parties have full knowledge, if you assume the party also knew about the patent or the defendant also knew about the patent, you assume validity, you assume infringement, you should assume, even in the indirect infringement stage, that the parties would know about the patent on the date of first sale. If that's the law, and I didn't find any cases addressing this issue on point, but if that's the law, I would say you should assume that when a party makes a sale in the U.S., that that should be the date of the hypothetical negotiation, even in the indirect infringement context. If you're not aware of the patent, you're totally ignorant. Well, if you're making sales in the United States, there's every incentive for the plaintiff, the patent holder, to approach you and ask for a license. So it seems reasonable to me that if you're going to assume validity and you're going to assume infringement, you should assume full knowledge on the part of the defendant as well. That would include knowledge of the patent, and you should set the negotiation at the date of first sale. If it is the date of first sale that controls instead of the notice date, the date of first sale by Quanah Computer was in 2003, that's in the record, by Quanah Storage was 2001. If notice is the proper date, then Quanah Storage had notice in 2002. If you're going to treat Quanah Storage and Quanah Computer as the same company, then you should assume that Quanah Computer also had notice back in 2002. Okay, anything else? Just on the exhaustion issue quickly, if I could address exhaustion, I think the facts of the jazz photo case are distinguishable. If you prevail on either exhaustion or on the implied license, then we don't need to worry about the date of the negotiation? There are a few nominal sales that wouldn't be covered by exhaustion or implied license. At a 6% royalty, I think I calculated the damages in the tens of thousands of dollars. It's a very nominal number of sales that were in our records, and we don't contend that those purchases in early 2000, directly from Quanah Storage to Quanah Computer should be covered by exhaustion. Just for purposes of us, in terms of work we have to do, would you withdraw your cross-payment on the issue if you prevailed on either exhaustion or on the implied license? Yes, Your Honor. Thank you. On the exhaustion, I think the jazz photo case could be distinguishable from the facts here, even if you assume a foreign sale. In this case, there's a worldwide license authorizing Sony and Philips to sell drives anywhere in the world. In jazz photo, the court believed that sale by Fujitsu of its products overseas may not have reflected the price of the sale of those products overseas may not have reflected its whole patent rights. But that's different here, where you have a worldwide license, an already paid-up license. So I think the fact of jazz photo, even if you assume that all the sales here are overseas sales, are distinguishable. Okay. Thank you, Mr. Burnett. I will now hear argument on the laser dynamics appeal relating to the grant of the new trial. Thank you, Your Honor. And can I reserve two minutes for rebuttal? Yes. Thank you, Your Honor. The district court clearly erred in setting aside the first jury verdict in terms of damages and ordering a new trial. The district court did that on two bases, that the verdict was against the great weight of evidence and that the damages were excessive. This case turns on the Fifth Circuit standards for evaluating that type of a judgment. The Fifth Circuit has made clear that a new trial motion is looking at, even if the winning party has sufficient evidence, if the other party has so much evidence and the record is so one-sided that it's against the great weight of evidence. That's the Fifth Circuit standards. Counsel, what's the quantitative basis in the record that supports a 6% royalty rate? Your Honor, the quantitative basis in the record in the first trial was Mr. Murtha, who was the damage expert, looked at a series of the LES licensing report and he picked out two particular agreements in that report and used that as the basis of the 6% number. I want to be very clear about something, though. That was not the basis for the new trial. In fact, the district court specifically denied a request for a new trial on the question of whether or not 6% was an adequate basis or not. That's a JA-0006. The agreements you're talking about, those don't relate to the patent. Your Honor, that's what the district court determined when there was a Daubert motion in the second trial. So what's the quantitative basis for the 6% royalty? Your Honor, those agreements don't relate to the patent. They relate to similar technology and the question of whether it was similar enough or not is a classic type of issue that would be addressed on Daubert. In this case, in the new trial order, the district court specifically said, I am not going to grant a new trial on that issue of the rates, which means the standard of review for this court is an absolute absence of evidence. And once there's testimony in the record that says 6% is the number, it cannot satisfy the absolute absence of evidence to test in terms of the 6% rate. In the second trial, the 6% rate was based on agreements that were with respect to these patents where there was a running royalty rate. One of them that was in the 8% range. Another one that was in the 15% range. One of them was a lump sum for $60 million. So in the second trial, when there actually were Daubert objections... That was the Ben Q settlement? That's correct, Your Honor. That was the Ben Q settlement in the second trial. In terms of the standard... Are you saying that a settlement on the doorsteps of a courthouse, that that's evidence of remarkable value? Your Honor, the evidence in front of the district court      Ben Q was just like the other 27 agreements that were used by the district court in terms of the threat of litigation. It was based on the threat of litigation on the basis of quantity. They were all inspired by litigation. And so getting on whether one is close enough or far enough away from litigation... Our position was they all should have been excluded originally. And when the judge decided they were all going to come in, that's fine, but the good come in with the bad. In terms of the Ben Q settlement, that's the closest to the hypothetical negotiation date. That is the hypothetical negotiation date. It's 2006. And in Ben Q, because there was a sanction which said that the defendant lost some time in opening and closing in voir dire, it meant it was that much more difficult to put on a defense of infringement or invalidity. That made it that much more like a hypothetical negotiation in which you assume infringement and liability. So in the second trial, it was well set in terms of the 6% rate. In the first trial, the review for that would be... It was also well set on that record, that the review would simply be for a complete absence of evidence. Why don't you tell us why you think Judge Ward made a terrible mistake when he decided that your adversary had not waived its right to challenge the original jury verdict even after entry of judgment? Absolutely, Your Honor. That's the heart of this. It is. It is, Your Honor. A new trial motion on great weight of evidence only compares our stack of evidence with how big the other side's stack of evidence is. That's... In both Scott and the Conway case, in the Fifth Circuit, reversed district court orders for any new trial and made clear you cannot... The fact that a judge disagrees with the integrity of a witness is not sufficient. Likewise, the Fifth Circuit said that although it's an abusive discretion review, it's a heightened review, if you will, when you're talking about the great weight of evidence burden and that you can't use this for game law. This is the fundamental problem. Maybe you and I aren't talking on the same wavelength. What I understood to be your main problem here was that the trial judge said, wait a second, even after I've entered judgment on a $58 million jury verdict, the other side now complaining that the damages were excessive and I can reset it. Right. So you've got a first question about whether or not they preserved their right to challenge it and if they did, then you're going to have an argument about how the whole market value rule wasn't implied, et cetera. But you've got to get over, you've got to get past this waiver issue. Yes. And as I understand it, your adversary filed a motion in limine a doubtful motion right at the get-go saying, any damages, any evidence on damages other than these licenses that we put on would be excessive, would be illegal and permissible. Correct. So it would look, I'm just telling you where I'm coming from, it looked to me like the question, the issue of excessiveness of damages was preserved for a certain overall time, if you will, by the Dalbert motion that your adversary made. Two responses to that. First of all, the Dalbert motion said the rate that you have to rely on the agreements that were these past agreements because they set a rate and therefore anything that goes beyond that would be excessive. The district court specifically rejected that. No, I understand but I mean their point would be yes, we made an objection and it got, you know, we were overruled so we have preserved the question for post-trial, post-verdict. Actually, I'm jumping forward to the post-trial order. The new trial order said specifically that on that topic, this is at JA-6, on that topic, on the question of whether or not these agreements would set a cap, I am rejecting the request for a new trial on that. The plaintiff put forward an evidence that the jury could believe that. No, I understand. We're still missing each other. I think you need, you want to establish the fact that you think that the trial judge erred by entertaining the question of whether or not the first verdict was excessive in the first place. Absolutely. Because your view is that they waived that by not having raised it at some earlier stage in the case. I want to be specific about that. It's not a complete waiver of filing a motion at all in terms of an excessive motion. I understand. But it's very close to that on this record, which is the only type of excessive damage motion that could have been filed is a motion that says there's not any evidence in the record to show this number. I mean, look at the Fifth Circuit cases. If the evidence is in the record that shows the number, it gets credited. That's, for example, the Caldera case. The evidence in this record certainly showed the number. That's what cannot happen by the district court. It's for the district court to start weighing the evidence and saying, I like this or I didn't like this. Do we have the authority to do that? The only place the district court would have the authority to do that would be under a great weight of evidence standard. And that's talking about the total stack of evidence on Quanta's side versus the stack of evidence on our side. And the standard would have to be that the stack of evidence on Quanta's side is so great that it overwhelms our stack. He didn't do that at all. He said, there's nothing over here. I'm going to come over here and look at it and make credibility determinations in essence. And that's directly contrary to what Scott says he can do. And moreover, the evidence in the record was under any standard would have... Judge Ward said in his order that their adversary did not waive its right to complain about the jury verdict in its motion presentation.  of review for a new trial. Correct. Now, what's my standard of review on that decision he made? Okay. The standard of review in reviewing a motion for a new trial that was granted... I'm on the waiver issue. He made a finding. He said they have not waived their right. Okay? The question of whether or not... That's like an entitlement issue. Somebody shows up after a trial, after a jury verdict, after a judgment is entered and they come in and they say, Your Honor, I'm on a new trial. And the other side stands up and says, Well, why? And he says, Well, because your damage theory is not a legal, good legal theory. And so, and the judge then, someone says, Well, they can't make that argument. They waived it. They should have made it sooner. And the judge says, No, I disagree with you. It's not waived. So, it's just a waiver. Just a waiver. It would be an abusive discretion standard that the Fed Circuit says is a heightened review of abusive discretion. But, that said, when all the district court is doing is applying  and standards of review, an application of the wrong standard of review is by definition an abusive discretion. So, the standard has determined whether or not something was waived and what kinds of challenges can be made post-trial would be an abusive discretion. Given that, here, the district court applied the wrong standard in coming to the determination that there wasn't a waiver, it would be an abusive discretion. Your Honor, I'll go into my reserve rebuttal time for just one minute if I could. Well, I think you're out of time. You're over your time. We'll give you two minutes for rebuttal.  Okay. Thank you, Your Honor. Here, the $52 million verdict was 195 times greater than the largest licensee in the 16 non-litigation licenses. We know that. I mean, that's, that's, you know, we can read, we know that. So, on these guys... Your client got a big adverse jury verdict against it on a theory of damages that went to the jury that wrong, but it went there, he didn't object. The verdict comes out and you go and you say, oh my goodness, hmm, we want a new trial, but you hadn't raised any of these issues before. So, why isn't the district court judge abusing his discretion when he said you didn't waive the right to make this challenge? Well, he didn't abuse his discretion, one, because he applied the correct standard, which is whether the verdict is excessive, or, well, either against the great weight of evidence, or excessive based upon any rational appraisal or estimate of damages, and there was no objection on your part as to sufficiency during the trial. Well, we filed a down-bear motion, and we filed a motion to eliminate objecting to Mr. Bertha's methodology on the grounds that he should not apply a royalty rate to the price of the evidence presented. You did object at that time and say, look, we're not supposed to be getting into this area. Well, there's no requirement in seeking a new trial that you have filed, first of all, a down-bear motion or a motion to eliminate. There's no requirement at all. There's no requirement. You have a problem in the sense that the district court could have said you waived, maybe not on the great weight of the evidence, but you could have waived this argument about the entire market value rule. You could have said that. You didn't raise it, therefore, we're not going to consider it, right? I don't believe he could have said that, because one of the grounds for finding... Okay, well, assume he wasn't raised earlier. He could have said, I'm not going to consider it, right? I don't think that would have been legally correct, because one of the grounds... You're arguing my argument. He could have said that, sure, but would that be legally correct? No. I'm not sure if the appellate court would reverse it, but I believe that the reason he raised it... Let's assume that. Okay. But as I understand the Fifth Circuit law, also, if the district court decides that he is going to consider the issue and he's going to excuse the waiver, then he can do it and that it will be reviewed by the Court of Appeals on the merits of the issue. In other words, the district court can excuse the waiver. I don't think there was a waiver. I think when you're weighing the great weight of the evidence, they suggest... But if there was a waiver, he excused it. If there was a waiver, he excused it. But he expressly found that there was no waiver. That's in his mind. And they argued that. And maybe on a Daubert challenge, he was willing to say, okay, I'll let you put that on a trial. And I'll listen to what Mr. Murtha has to say. But when they got to trial, what did they do? They applied the entire market rule. That's what they  And I don't       that they should have no motion. You were suggesting that in either one of those motions, you were saying you couldn't apply royalty rate to the price of the computer or to the price of an optical disk drive. And that is in our motion. I think it's in both, actually. So we made those arguments to the district court. He was familiar with our arguments. He was the person listening to the evidence. Well, that's what I'm trying to get. Because I'm looking in my own mind to see what's the quality of the objection you were making initially at the trial. For purposes of whether or not a trial judge later on could say in his mind he thought you had sufficiently clear objections we were making and he expressly found... Why do you let the issue go to the jury? Why does a district court judge who's aware of the fact that he knows what the whole market rule is as well as we do? He doesn't need the unilog. He knows by right height. And so why on earth would he let this issue go to the jury? They've got an illegal theory in front of them. In the unilog case, for example, the district court said, once the total revenue figure is out of the bag, there's no fixing it. Once it was out of the bag, the judge didn't call a bench conference or he didn't stand up and object. We had filed the motion to eliminate, and you're right, we didn't stand up and object. On the other hand, Judge Ward is a very savvy trial judge, and I believe he knew at that point when they were comparing $2.6 billion in revenue to their damage claim of $52 million that they were doing what they said they weren't going to do and apply the entire market value rule. Once that $2.6 billion figure was out and the jury heard it, at that point it's out of the bag. And in unilog, the court said there's no instruction that I can give to a jury that will correct that. And I'm looking into Judge Ward's mind, but perhaps that's what it was. Why didn't he order a new trial on that basis, then? He did order a new trial on the basis of the entire market value rule. That was an incorrect application of the entire market value rule. It was on the basis of the entire   And Judge Ward was in essence saying when he granted your motion, I made a mistake, I shouldn't have let this issue go to the jury. Right? I could have waked up and leaned over and said, wait a second, if I send this to the jury and they come back with $2.6 billion in sale, there's nothing I can do to correct this. So let's see what the jury does and then I'll figure out whether I should correct it in some way. That's right. I believe that's what happened. Judge Ward was very close to these arguments and he expressed himself as a waiter and he was the person on Abraham listening to the counsel argue this issue. And he did look at Mr. Murtha's $2 million figure in deciding whether to grant a new trial. He just said, well, that is an improper application of the entire Rocky Valley rule, so he didn't just discard it as counsel or as the dynamics suggest. He looked at it, but it was evident that he is not required to credit. He is allowed to weigh the evidence on a new trial motion. He can do that, not just his duty and his job. And he exercised that duty here, found that it was an error of law and granted a new trial. Okay. Thank you, Mr. Gardner. Mr. Gardner, you have two minutes. Thank you, Your Honor. First, with respect to the issue of waiver, the district court didn't say that there was no waiver per se. What they said is that you can't waive the right to seek a new trial. But what the Fifth Circuit said is well, that's always true. You can't waive the right to seek a new trial. The bases on which you can argue for a new trial are strictly limited to what happened in the record before that. You can't use a new trial to argue child abortion. You can't use it unless the district court lets you. There is no case law that suggests that can happen. In fact, both the two instances when the Fifth Circuit overturned that are the economy cases. Well, take a look at Gary at 661 Fed 3rd at 248. It's a Fifth Circuit case from last year. It's not cited in the briefs. The other point along that is in a new law case, the district court can reverse a brand new trial and can both the JMOL side and the new trial side make a comment about the experts that claim there is no reason to reverse the new trial order. In this instance, the district court had to accept the evidence that was in the record. And the balancing, the weighing that you do, isn't to say I don't find it necessary to reverse the new trial order. I don't think  is necessary to reverse the new trial order. I don't think that is necessary to reverse